Robert Lee **MONICAL**, Jimmy Dale Monical and Kathryn Luwanda Monical, Respondents,

v.

**ARMOUR AND COMPANY**, a Corporation, Appellant.

No. 46261.

Supreme Court of Missouri, Division No. 1.

Nov. 12, 1957.

Opinion Modified on Court's Own Motion Dec. 9, 1957.

Rehearing Denied Dec. 9, 1957.

Brown, Douglas & Brown, R. A. Brown, St. Joseph, for appellant.

Randolph & Randolph, by Lewis F. Randolph, St. Joseph, for respondents.

VAN OSDOL, Commissioner.

This is a Workmen's Compensation case. Defendant employer and self-insurer Armour and Company has appealed from a judgment of the Circuit Court affirming a $12,426 award of the Industrial Commission for medical aid and burial expense, and for death benefits to the three dependent minor children of deceased employee, Robert Monical.

In this case the underlying factual questions are whether employee sustained an "accident"—a blow on the head on April 16, 1956—with ensuing hemorrhage and deterioration of the cells of the brain; and, if so, whether such ensuing hemorrhage and deterioration caused employee to lose his sense of equilibrium and suffer a fatal fall on April 17th.

As indicated, the alleged accident occurred April 16, 1956, while employee was working, "dropping hogs," at employer's plant. It was the theory of claimants-respondents that employee was struck on the head by the lever of a mechanism consisting of a hook with weighted lever used in releasing the carcasses of hogs as they were passed along an overhead elevated carrier track or rail to a point where they were "dropped" to a scalding tank. Employee was stationed along and under the elevated track or rail on a catwalk with handrailings. As the hogs were moved down the incline of the overhead carrier rail, it was employee's duty to use the lever of the releasing device in such a way that the hogs were released and dropped to the scalding tank where one Boyle Parham had the duty of managing the scalding process. The lever—two or three inches wide, a quarter of an inch thick, five feet long, with a fifty or sixty pound weight on the end—was overhead, as stated, and there had been "trouble down there about that lever tripping without being pulled, and hitting the men on the head."

The witness Parham testified that in the late morning of April 16th, he noticed that the hogs "quit coming down"; he glanced up toward the place or station on the catwalk where employee Monical worked; Monical was leaning against the handrailing of the catwalk and "had his cap off a-rubbing his head." Parham asked employee "what was wrong." Employee Monical said "that damn lever hit me on the head." It might have been "a minute or two minutes or three minutes, I can't say" from the time the hogs "quit coming down" until the time Parham glanced up and asked Monical what was wrong.

Commission made findings of fact and conclusions of law, including the following,

"We find from all the evidence that the employee, Robert Monical, sustained an accident on April 16, 1956, arising out of and in the course of his employment with Armour and Company, which caused an injury to his brain. We further hold that the testimony of Boyle Parham, 'He said that damn lever hit me on the head—', was admissible in evidence as being a spontaneous statement by Robert Monical within a few minutes after sustaining the accident found herein. Soderstorm v. Missouri Pacific Railroad Co., Mo.App., 141 S.W.2d 73. We further find from all the evidence that injury to his brain caused by the accident of April 16, 1956, caused him to fall over backwards, on April 17, 1956, which resulted in injuries producing his death on April 18, 1956."

Our examination of the record convinces us that Commission correctly found the immediate cause of employee's death was a fracture of the occipital, basal portion of the skull, with hemorrhage of the basal area of the brain sustained when he fell over backwards on April 17th. And the medical testimony is substantial and convincing in tending to show that employee suffered a hemorrhage of the left frontal lobe of the brain (the right frontal lobe was mildly affected) on an earlier date, and that the deterioration of the cells of the brain due to the hemorrhage of earlier origin caused the fatal fall April 17th. However, physicians, witnesses for employer, who testified of the degeneration of the brain cells as disclosed by an autopsy, were of the opinion the earlier hemorrhage had its origin prior to April 16th; and, consequently, it is employer's theory that employee's death was not by "accident," as the term is used by the Workmen's Compensation Law (Section 287.010 et seq., RSMo 1949, V.A.M.S.), occurring April 16th. It is argued that employee's death was due to some condition of the brain existing or trauma experienced prior to that date. Employer contends the finding and award of Commission are not supported by competent evidence, and are contrary to the substantial evidence considering the record as a whole. Employer also contends Commission and the Circuit Court erred in admitting into evidence and considering, as part of the *res gestae,* Parham's testimony that employee had said he had been struck by the lever.

■ "In reviewing this workmen's compensation case we have the duty of determining whether the Commission's award is supported by competent and substantial evidence upon the whole record. Const. Art. 5, § 22, V.A.M.S. This does not mean that we may substitute our own judgment on the evidence for that of the Commission. But we are authorized to decide whether the Commission could have reasonably made its findings and reached its result, upon a consideration of all of the evidence before it, and to set aside its decision if clearly contrary to the overwhelming weight of the evidence. Wood v. Wagner Electric Corporation, 355 Mo. 670, 197 S.W.2d 647." Foster v. Aines Farm Dairy Co., Mo.Sup., 263 S.W.2d 421, 423; Conley v. Meyers, Mo.Sup., 304 S.W.2d 9.

■ Attending the contention that employee's statement was erroneously admitted into evidence—

There was evidence that the lever of the hook-and-lever device was so placed overhead as to permit the lever to come into contact with the head of an employee working on the catwalk. In fact, Parham testified that he and others, when engaged in dropping hogs, had been hit on the head by the lever a number of times. There was evidence that employee for some reason had stopped working and was leaning against the handrailing of the catwalk, had removed his cap and was rubbing his head indicating that he was experiencing pain. It would seem that the statement of employee that the lever hit him on the head was made at a time when he apparently was experiencing pain or shock and excitement due to the contact of his head with some object, and was so intimately connected with or so patently grew out of the facts or circumstances making up the event or transaction as to be a part or the spontaneous product of them. Now it is true the statement was made a minute or two or three after the circumstance of the cessation of employee's work, and was in response to Parham's question. But a statement may be the spontaneous product of an event itself, although made in response to a question. Cummings v. Illinois Cent. R. Co., 364 Mo. 868, 269 S.W.2d 111, 47 A.L.R.2d 513; Meyers v. Smith, Mo.Sup., 300 S.W.2d 474. See also and compare Roach v. Kansas City Public Service Co., Mo.Sup., 141 S.W.2d 800. And in considering the admissibility of this class of statements, it is fallacious to suppose that a statement must have been strictly contemporaneous with the exciting cause, although the utterance must have been while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance. Vol. VI, Wigmore on Evidence, 3d. Ed., § 1750, p. 142. The essential test of the admissibility of this class of statements is *spontaneity*. The lapse of time involved is material mainly as evidence of lack of spontaneity. "Certainly the true test is neither the time nor the place of a statement but whether it is a spontaneous statement produced by the event itself." Sconce v. Jones, 343 Mo. 362, 121 S.W.2d 777, 782; Cummings v. Illinois Cent. R. Co., supra. We hold there was no error in admitting into evidence and considering employee's statement. Cummings v. Illinois Cent. R. Co., supra; Roach v. Kansas City Public Service Co., supra; Sconce v. Jones, supra; Bennette v. Hader, 337 Mo. 977, 87 S.W.2d 413, 101 A.L.R. 1190; Smith v. Southern Illinois & Missouri Bridge Co., 326 Mo. 109, 30 S.W.2d 1077; Pryor v. Payne, 304 Mo. 560, 263 S.W. 982. And we further hold there was competent and substantial evidence tending to show employee on April 16, 1956, suffered a blow on the head by the lever of the releasing device while engaged in work for employer.

Considering the record as a whole, were there reasonable bases for the conclusion that, due to the blow on the head April 16th employee suffered a hemorrhage and deterioration of the cells of the frontal lobes of the brain which caused him to lose equilibrium and fall on April 17th?

Helen Monical, formerly the wife of employee, testified that she and their three children were living with employee at the time of his death. She testified that employee was in good health when he left home for work at five-thirty in the morning of April 16th. When she returned from her work between four-thirty and five o'clock in the afternoon, employee was at home sitting "stooped over" in a chair with his face in his hands. He had a bruise or cut on the right side of the forehead up near the hairline; he had a headache and his eyes were hurting. He ate no supper and retired at six-thirty—much earlier than usual. When walking he staggered; he was unsteady and held on to the bannister when going up the stairs; at the head of the stairs he stopped for about a minute and rested his head on his hands. He was restless throughout the night; he'd get up and sit on the side of the bed with his face in his hands. In the morning of the 17th his eyes were "bloodshot." He was staggering again, and said he felt dizzy. He ate no breakfast, and departed for work remarking that he would see a doctor the next day.

When he reported for work at employer's plant in the morning of the 17th, employee exchanged his work on the catwalk for an easier task.

There was evidence there was nothing physically wrong with Monical before April 16th, except "tooth trouble" and "sinus trouble"; and he had experienced nosebleed. Employee's son, Robert Lee, fourteen years old, testified his father was well prior to the 16th. Employee had engaged in play with his son Robert Lee the preceding day, Sunday, April 15th. Other witnesses stated that Monical apparently was in good health prior to April 16th.

In the afternoon of April 17th, employee, having finished his work for the day, was looking at a package of meat he had ordered prepared for his own use. He was standing on the concrete pavement just within the east outer gate of the plant. A witness said Monical was stooped down "when I saw him —and I just thought he was raising back up, but instead of raising, he raised straight up, and then came straight back, right on the pavement." Employee was unconscious for a time, but revived and was taken home in an Armour police car. While at home he became violent and was handcuffed, strapped to a cot and taken by ambulance to State Hospital No. 2, where he died at five-thirty in the morning of April 18th.

The pathologist of the State Hospital performed an autopsy in the morning of April 18th. It was discovered that employee had suffered a linear (somewhat irregular) hairline occipital skull fracture. Beyond doubt the fracture of the skull was caused when employee suffered the seizure and fell over backward on April 17th. The immediate cause of death was the hemorrhage in the brain cavity resulting from the fracture. The pathologist in his report and summary of anatomical diagnoses included the diagnosis of the "central nervous system" as follows: "Hemorrhage, recent, extensive, subdural, left hemisphere. Hemorrhage, 'subacute', left frontal lobe, anterior, with hemorrhagic degeneration adjacent brain substance. Hemorrhage, recent, basal areas, skull. Fracture skull, recent, linear, occipital, basal portion." Under the paragraph "Miscellaneous" it was said that the hemorrhage, left frontal lobe, *is most likely several days old,* while the main quantity of the sub-dural hemorrhagic mass appears to be more recent." (Our italics.) And the pathologist, as a witness for employer, testified that the lesion of the frontal lobe was at least several days old. He definitely was of the opinion it occurred prior to April 16th. He said, "There was a hemorrhage in there that was at least 3 days old, and probably more," although upon cross-examination he said, "I'm not going to say now * * * how many days old this first hemorrhage was * * *." Another physician, witness for employer, who was not present at the autopsy, was in agreement with the opinion of the pathologist that the first and frontal hemorrhage occurred prior to the date of the alleged accident. He spoke of the possible significance of nosebleed as indicating an infection of the nose. He said if employee had a severe acute infection of the nose which had gone through the skull plate, this could cause an acute inflammation of the frontal lobes of the brain and ensuing hemorrhage. He thought the inflammation of the frontal lobes had existed for "a matter of weeks," and was the cause of employee's seizure and fall on April 17th.

On the other hand, physicians, witnesses for claimants, testified in effect that, although there may be two areas of hemorrhage and it may be determined that one is of the more recent origin, you couldn't say that one is one hour old and the other is twelve hours older or that "this is one day old and this is six days old." It was said that a doctor would "stick his neck out" if he were to say, " 'This is absolutely more than two days, that it is three days,' you see this is sort of a fine point here." These doctors were of the opinion the primary or older (frontal) hemorrhage was of traumatic origin. They minimized the signifi-

cance of the evidence of "sinus trouble" and nosebleed. Answering a hypothetical question embracing the evidence of the blow on the head experienced on the 16th and employee's appearance and demeanor and complaints after he was struck on the head the 16th and in the morning of the 17th, one physician said these facts "tie in with brain hemorrhage." Another, witness for claimants, who was present at the autopsy, testified it was his opinion that such symptoms "indicate a brain injury" and "bleeding in the brain."

Counsel for employer in framing hypothetical questions to physicians included the hypotheses of statements purportedly made April 18th by Helen Monical in an interview with a physician at State Hospital No. 2. A stenographic transcript of the interview included Helen's statements that employee drank to excess, although he did not drink while at work; that "the last two or three days he acted sick; he said his head felt funny, a ringing in his ears. For the last month when he blew his nose a lot of blood would come out with it. * * * During the last week he has said he was awful sleepy, would come home from work, go to bed at 6:30 in the evening." The physicians, witnesses for employer, in expressing their opinions attached significance to drowiness and excessive nosebleed as indicatory of "brain trouble" prior to April 16th; and it was conceded by a physician, witness for claimants, that drowsiness is one symptom of frontal lobe damage. On the witness stand, however, Helen Monical denied making the statement that during the last week, employee had said he was "awful sleepy"; and denied that he had gone to bed at six-thirty in the evenings prior to the evening of the 16th. She further explained that in the use of the phrase "the last two or three days" she meant the period of time since employee had experienced the blow on the head, April 16th.

▆▆▆ Employer, in its brief herein, stresses the quoted transcribed statements of Helen in the interview with the doctor, and seeks to attach decisive weight and value to the opinions of physicians based in part on the facts purportedly stated by her. Obviously, if Helen's testimony while on the witness stand relating to employee's condition after he had suffered the blow on the head and in denial and explanation of the quoted portions of the transcript of her interview with the doctor is to be believed, the foundation of the opinions of employer's medical men was in part eroded. Employer further argues at length the weight and value of the findings recorded in the autopsy report and urges that great weight should be given to the testimony of the pathologist who performed the autopsy because this physician was a specialist in pathology and the physicians testifying in behalf of claimants were not. And other portions of employer's brief herein also treat with matters bearing upon the credibility of other witnesses and the weight and value of their testimony. These matters were for the Commission's consideration. Arnold v. Wigdor Furniture Co., Mo.Sup., 281 S.W.2d 789; Smith v. Smith, 361 Mo. 894, 237 S.W.2d 84; Scott v. Wheelock Bros., 357 Mo. 480, 209 S.W.2d 149. The findings recorded in the autopsy report were not conclusive as to the time of the earlier hemorrhage; and we have no doubt Commission considered that the pathologist, witness for employer, was a specialist in the science of pathology and that claimants' witnesses, physicians, were not. We have the opinion that it reasonably could be found from the medical evidence stated supra that employee suffered a frontal hemorrhage April 16th as a result of the blow on the head. The testimony of physicians, witnesses for claimants, is substantial in tending to support such a conclusion. The Commission as the trier of the fact, had the choice of the conflicting opinions of the physicians. Cole v. Best Motor Lines, Mo. App., 303 S.W.2d 170. And we, in passing, have not overlooked the probative effect of the testimony of lay witnesses of employee's good health prior to April 16th and of his condition subsequent to the blow on the head suffered that day. Conley v. Meyers, supra, and cases therein cited.

Consequently, we say that our examination of the whole record discloses that Commission's award was supported by competent and substantial evidence, and that the judgment affirming Commission's award should be affirmed.

It is so ordered.

COIL and HOLMAN, CC., concur.

PER CURIAM.

The foregoing opinion by VAN OSDOL, C., is adopted as the opinion of the court.

All of the Judges concur.