Pauline R. MARCUS et al., Respondents,

v.

STEEL CONSTRUCTORS, INC., et al., Appellants.

No. 52703.

Supreme Court of Missouri
Division No. 1.

Nov. 12, 1968.

Motion for Rehearing or to Transfer to Court En Banc or to Modify, or Clarify Denied Dec. 9, 1968.

E. E. Thompson, Edgar S. Carroll, Kansas City, for respondents.  Popham, Thompson, Popham, Trusty & Conway, Kansas City, of counsel.

Jack B. Robertson, Rogers, Field & Gentry, Kansas City, for appellants.

J. MORGAN DONELSON, Special Judge.

This is a workmen's compensation case wherein maximum benefits were awarded in the death of Eddie J. Marcus to his widow and sixteen year old daughter for a total of $20,580.31.  On appeal to the Circuit Court the award was affirmed.  The employer and insurer appeal from the judgment rendered.

■  At the time of the death of Marcus, § 287.240(4) (b), RSMo 1959, V.A.M.S., contained no provision that death benefits payable to a minor dependent would terminate even though the minor dependent might die, marry, or attain the age of eighteen years.  The entire amount of the award is therefore vested; we have jurisdiction of the appeal.  Article V, Section

3, Constitution of Missouri 1945, V.A.M.S.; Gennari v. Norwood Hills Corporation, Mo., 322 S.W.2d 718. In 1965 the above section was amended by the Legislature to provide for such contingencies.

The findings of fact of the Referee were adopted by the Industrial Commission and in part found that Eddie J. Marcus " * * * contracted an occupational disease as defined by section 287.067, RSMo 1959, arising out of and in the course of his employment with Steel Constructors, Inc., said occupational disease being pancytopenia and hyperplastic bone marrow, and that said occupational disease was caused by an exposure to toxic fumes containing benzol, commencing in March 1960, and subsequent exposures to toxic fumes from welding galvanized metal and cutting and burning through layers of paint with an acetylene torch, to which fumes said employee had become sensitized during his employment with Steel Constructors, Inc., until November 1963, when he became totally disabled as a result of said occupational disease and that as a further direct result of said occupational disease employee died on April 2, 1964."

Eddie J. Marcus was employed for some seventeen years as an iron worker, welder, and foreman by Steel Constructors, Inc. He continued his employment until November 27, 1963, except for brief periods while he was in the hospital. He died on the date above indicated, and he was survived by Pauline R. Marcus and Sharon Lee Marcus, his widow and sixteen year old daughter.

Prior to March, 1960, Marcus had been in good health, and he was a good workman for his employer. This was substantiated by fellow worker, Delbert Lewis, and Marcus' wife, Pauline, who testified that thereafter "he did not have the pep and energy he had before and he had numerous complaints." In March, 1960, Marcus and others, in the course of their employment were working at the Inter-Collegiate Press building in Johnson County, Kansas. The work involved the removal of an old roof and the erection of steel structure for an additional floor on the existing one-story building. The roof was of gravel and creosote or tar composition. An undetermined number of exhaust pipes or vents were on the roof of this building. They were also described as ventilating ducts which were staggered in various locations on the roof. The plant at this time was in operation. Marcus stated in his deposition that there was something flying around in the air that would "just burn the devil out of your face and hands." He did not know what caused it while they were chopping off the old roof, and he did not know what was "coughed out" of the ventilating ducts. Marcus worked on this job for two days until his hands, face and neck "swelled up real bad", and he left the job. Some of the other workmen were affected with a stinging, burning sensation to their faces. One witness described it as similar to sunburn. Other workmen were not affected at all. On March 26, 1960, Marcus consulted Dr. Alvin Silvers, his family doctor, who found an acute facial and neck irritation or rash which he diagnosed and treated as contact dermatitis. Sometime during May, 1960, he returned to the same job, but he could work only one-half day. He again had a burning of his face within two hours after returning to the work. There were three occasions when he worked on this particular plant roof. Each time his hands and face would become red and swollen. He requested a transfer to other work at another location which was granted by his employer. Dr. Silvers continued to see and treat him several times in 1960, for various complaints, but primarily for what he thought was contact dermatitis.

Fellow worker, Harry George Waibel also testified by deposition. He was acquainted and worked with Marcus on the job in March, 1960. In fact he replaced Marcus on the Inter-Collegiate Press job as foreman. He stated that he had observed Marcus' face and hands at times

when they would be red and swollen. He noticed the exhausts or vents on the roof also. He indicated that if you stood next to one of the vents you could feel heat, but you could not see anything. There was nothing unusual about the roof and there was nothing blowing in the air. He did not form an opinion as to where the substance which caused the discomfort came from, except that it was evidently something on the roof. He did not know whether the cause was in the roof itself, or something that came out of the ducts. The work on the roof was done out in the open air with the wind blowing, and the heat that came out of the ducts was dissipated by the wind.

In April, 1961, Marcus in his employment installed a solar screen in a dusty building at Liberty, Missouri. He there suffered excessive nosebleed which he was unable to arrest without medical assistance. His symptoms were shortness of breath, pain in calf muscles of his legs, and a bleeding tendency which Marcus said dated from March, 1960. He was subsequently admitted to a hospital where necessary surgery was performed to stop the bleeding. During his hospitalization Marjorie S. Sirridge, M.D., who specialized in and limited her practice to hematology was called for consultation and treatment of Marcus. At various intervals she continued to treat him until his death. Marcus' hospital laboratory report was examined by Dr. Sirridge who determined that in addition to the nosebleed Marcus had pancytopenia or anemia. Bone marrow studies were made and it was found to be hyperplastic, meaning increased cellularity in the marrow. It was, in other words, an abnormal bone marrow with an absence of any primary hematologic disease, such as cancer, leukemia, sarcoma, or myelofibrosis. It was her opinion that a toxin had affected the bone marrow. She treated him, and he was released from the hospital on May 2, 1961. Dr. Sirridge continued treatment and she found a continued improvement in his blood condition. In April, 1962, it was her

opinion Marcus' blood was completely normal. It was also her opinion that the bone marrow had not been so greatly damaged that it could not recover by the use of stimulants.

Witness Delbert Lewis in March, 1960 worked under Marcus as his foreman at the Inter-Collegiate Press Kansas plant. He described in similar fashion the plant or building and the work performed. He confirmed that Marcus' hands and face "swelled real bad" after working on the roof of the building for about two days. He also worked with Marcus in May when he returned to the job, and again observed that Marcus had the same reaction as on the first occasion. He remembered the ducts or vents on the roof, but he likewise did not know their purpose or function. He was also working with Marcus at Liberty in April, 1961, when Marcus suffered the nosebleed. He stated that he and Marcus did a lot of welding of galvanized metal and inhaled these fumes at various times between March, 1960, and November, 1963.

Marcus also worked for his employer at Leeds, Missouri. This work consisted of burning out rivets on trusses. Paint was burned off in the process which resulted in fumes which were inhaled by him. He had worked on this job on May 21, 1963, and during the night while at his home he suffered a grand mal seizure, diagnosed later as a cerebral convulsion. Marcus was hospitalized for four days, but during this period of hospitalization he suffered another seizure of the same type. It was determined that the seizures were most likely due to small vessel thrombosis associated with blood dyscrosia. After the seizure in May, Dr. Sirridge followed Marcus rather closely, and after his discharge from the hospital she saw him in her office on various occasions. On August 19, 1963, when she saw him again, she noted an increase in his eospenophils which is most often associated with hypersensitivity and allergy. She had not noted any symptoms before this time, and she requested he return for

another blood count on August 31st, at which time the eospenophila was normal.

Drs. Weiford and Fowler also were treating Marcus for his seizure problem. They referred him to another specialist for tests. He found Marcus to have pancytopenia. He was again referred to Dr. Sirridge who hospitalized Marcus from November 22, 1963 to November 26, 1963. The diagnosis at this time was pancytopenia cause undetermined, hyperplastic bone marrow, toxic depression vs. preleukemic leukemia. Treatment was begun as in 1961, but it aggravated his seizure problem. He had another grand mal seizure and was again hospitalized from December 1, 1963 to December 5, 1963. Treatment was continued, but Marcus' condition continued to deteriorate with four subsequent periods of hospitalization until his death on April 2, 1964. The necropsy report covering the post-mortem examination of Marcus revealed pancytopenia with aplastic bone marrow, due to undetermined cause. No primary diseases were found.

In evidence is a billing statement from a chemical solvent company to Inter-Collegiate Press at 611 Wyandotte, Kansas City, Missouri, for delivery at 6015 Travis Lane, which included under date of October 19, 1959, an item of five (5) gallons, designated as "benzol." We note that both parties herein have assumed this to be the Johnson County, Kansas, printing plant location. Another statement dated March 29, 1960, from the same company to Inter-Collegiate Press at Kansas City, Missouri address for five (5) gallons of benzol, showing the price and Kansas sales tax charge. A similar statement dated December 15, 1960, from the same company was for five (5) gallons of benzol, with a charge for the Kansas sales tax. There was no other indication on either of the last two statements where delivery was made. Dr. Sirridge described benzol as a compound used in most solvents. It is an excellent solvent for all organic compounds, and it is used by the printing and other industries because it is an excellent cleaner. It is, however, extremely toxic, and is high on the list of toxic substances or agents which can cause bone marrow damage. She stated that there were many hundreds of known toxic substances and chemicals which could cause this condition, including some household pesticides, insecticides and some drugs. Many of the offenders are not yet known or classified. It was her opinion that the exposure time to toxic substances required to result in damage would depend upon the individual and his sensitivity to the substance, that after the first exposure each subsequent exposure would require less time to result in damage, and that Marcus had developed an allergic or super hypersensitivity to some kinds of chemicals and substances. It was further her opinion that Marcus had been exposed to a toxic substance prior to his first difficulty and again re-exposed around August, 1963, either to the same or another toxic substance which again damaged the bone marrow and from which damage he was unable to recover. She did not name a specific toxic substance, including benzol, which caused Marcus' condition. She only discussed the possibility that the second exposure might be from fumes resulting from the welding with galvanized metal or burning paint. She also stated that such a bone marrow condition could develop without being able to medically determine the reason therefor.

■ Dr. William Edward Larson, who also specialized in hematology, was called as an expert witness by Appellants. He had not treated nor examined Marcus. Much of his testimony is in conflict with the other medical evidence. We realize the Commission as the trier of the facts had a choice of the conflicting opinions of the physicians. We shall therefore only set forth such portions of his testimony as is consistent with the findings and award. Monical v. Armour and Co., Mo., 307 S.W.2d 389, 394. He stated that benzol is toxic and the condition is or may be caused by inhalation or be absorbed through the skin. It was his opinion that if Marcus

had been working on top of the printing plant in the open air for two days, and if he was there exposed to benzol, that this would have been an acute exposure. He disagreed, however, that such would cause a marrow toxicity. He stated also that persons can develop a sensitivity to toxic substances so that a subsequent exposure of lesser degree may produce the condition or damage. Dr. Larson stated also that with respect to benzol, if the concentration of benzol is above accepted limits it can be smelled.

Appellants contend, first, that the award based upon the findings that Marcus' condition resulted from an exposure to benzol and fumes from galvanized welding and burning paint were not supported by competent and substantial evidence and, therefore, erroneous; and second, that the condition from which Marcus suffered is not an occupational disease within the meaning of the statutes.

In Merriman v. Ben Gutman Truck Service, Inc., Mo., 392 S.W.2d 292, 296, we said, "We are mindful of the general rules that as to fact questions the reviewing court does not substitute its judgment for that of the commission; that such an award is to be set aside only when not supported by substantial evidence or when clearly contrary to the overwhelming weight of the evidence; that such evidence, including all reasonable legitimate inferences, will be viewed in a light most favorable to the award; that the commission could judge the credibility of the witnesses, and that burden of proof is on claimant to prove his claim. (Cited cases)."

When the record of this case is considered under these rules of law, we must agree with appellants' first contention, and further our examination of the evidence reflects no direct and causal connection between the conditions under which Marcus worked and the disease which resulted in his death. The evidence relating to benzol is limited. We find there is substantial evidence that the Inter-Collegiate Press Company is a printing company; that benzol is used by the printing industry; and that three (3) separate purchases of five (5) gallons of benzol were made by said printing company. Two of these purchases were made subsequent to the time Marcus first worked on the roof of the plant in Kansas. No employee of the printing company, or anyone else, testified as to the purpose for which the benzol was purchased, where it was delivered, when it was used, how it was used, whether it was used at the Kansas plant or elsewhere, and whether if used at the Kansas plant, it could be discharged to the roof. We note the evidence that heat came from the roof ducts or vents which dissipated in the open air, but there is no evidence fumes of any kind came therefrom. The evidence does not establish the cause for the discomfort and reaction of Marcus and some of the other workmen, whether the cause came from the vents, the roof, or simply was something blowing in the air. The Commission from this evidence or lack thereof inferred that the purchases of benzol were delivered to and used in the printing plant in Kansas, that the benzol purchased in October, 1959, was used at said plant in March, 1960, while Marcus worked on the roof thereof; that the benzol being used therein was volatized and discharged through the vents or ducts on the roof; and that Marcus inhaled sufficient quantities thereof for a sufficient length of time to cause pancytopenia which lead to his death. We find no medical evidence that Marcus had been exposed to benzol fumes. Dr. Sirridge did not name any specific toxic substance to which Marcus was exposed. Although in answer to a hypothetical question which *assumed* that Marcus had been exposed to fumes and that benzol was used in the printing plant, it was her opinion that there was a probable connection between the toxic exposure and the damage to the bone marrow which resulted in the condition which brought about his death. Neither Dr. Sirridge nor Dr. Silver stated that the fumes produced

from welding galvanized metal or the fumes produced by burning through layers of paint with an acetylene torch were toxic or would cause pancytopenia. Dr. Sirridge only discussed the *possibility* that the second exposure *might* have been from welding the metal and burned paint. Upon careful examination of the record it is clear that the inferences made by the Industrial Commission are built one upon the other, and they are not reasonable. Inferences, to be permissible, must be reasonable, and no fact may be found nor an award be based upon mere suspicion or conjecture. We can and will not substitute a liberal construction of the evidence for failure of proof. There is no substantial or competent evidence to support the findings and award of the Commission that Marcus was exposed to benzol, or that his condition and death directly resulted from exposure to benzol and fumes from galvanized welding and burned paint. Merriman v. Ben Gutman Truck Services, Inc., supra; Pipes v. Missouri Pacific Railroad Co., Mo., 338 S.W.2d 30, 36; Shrock v. Wolfe Auto Sales, Inc., Mo., 358 S.W.2d 812, 815(3); Finerson, et al., v. Century Electric Company, Mo., 227 S.W.2d 740, 745.

█ However, this type of injury or ailment and the medical testimony appear to be in an unusual and rather obscure field, and it does not appear with certainty that the evidence could not be developed sufficiently to support a claim under the liberal provisions of the Workmen's Compensation Act. Therefore, the cause should be remanded to afford claimant an opportunity to produce additional evidence, if it is available.

Accordingly, the judgment is reversed and the cause remanded with directions to remand the cause to the Industrial Commission for further hearing and findings based on all the evidence adduced.

All concur.