Virgil ESTES, Employee-Appellant,

v.

NORANDA ALUMINUM, INC.,
Employer-Respondent,

Royal-Globe Insurance Company,
Insurer-Respondent.

No. 10903.

Missouri Court of Appeals,
Springfield District,
Division Three.

Nov. 20, 1978.

Joseph P. Fuchs, Dempster, Fuchs and Barkett, Sikeston, for employee-appellant.

Manuel Drumm, Sikeston, for respondents.

BILLINGS, Judge.

The Circuit Court of New Madrid County reversed the order of the Industrial Commission awarding benefits to employee Virgil Estes and this appeal followed. We agree with the trial court that the evidence fails to demonstrate a causal relation between the employee's occupation and his alleged occupational disease and affirm the judgment.

Estes began employment with Noranda Aluminum in June, 1971. He worked as a laborer for three to six months, as a metal handler for six to eight months, and then was a saw operator for three or four months. His next position was as a direct

chill operator and he continued in this job until August, 1973, when he sought medical aid for pain in his left leg.

One of the duties of a direct chill operator involves fluxing of molten metal. This process is accomplished by injecting chlorine gas into the bottom of the furnace by means of a wand which is about fifteen feet in length. The wand is inserted through a door in the furnace, the chlorine gas is mixed with the liquid aluminum, and any impurities which rise to the surface are skimmed off. The aluminum is then transferred from the melting furnace by way of open pouring troughs. Estes related that the fluxing process created fumes which he was exposed to, and on occasion chlorine gas leaked and escaped from the wand.

Estes was first treated by a local physician who referred him to Dr. Snyder, a Memphis, Tenn. neurological surgeon. Examination and testing in August, 1973, resulted in a diagnosis by Dr. Snyder of peripheral neuropathy, "either secondary to infectious polyneuritis or some type of toxic neuropathy," "*probable* toxic neuropathy." A second visit to Dr. Snyder in August, 1973, showed little change in Estes' condition and the doctor recommended he avoid any job which required him to have any exposure to chemicals, "since his findings suggested the *possibility* of a causal relationship with his general neuropathy." Further examination of Estes in November, 1973, "revealed generalized peripheral neuropathy, toxic response, probably infectious in origin. It was either toxic or infectious in origin." Dr. Snyder saw Estes again in December, 1973, and February, 1974, and testing showed peripheral neuropathy. (our emphasis)

In response to a question on direct examination as to the cause of Estes' condition, based upon a reasonable medical certainty, Dr. Snyder answered:

"A: It is my *impression* that this patients [sic] symptoms are *probably* related to being around some type of chemicals, since the diagnosis of toxic neuropathy was made and established on the basis of his EMG (electromyogram—test of electrical activity of muscle) findings, and since no other abnormality could be established as the etiology of his complaint; since the myelogram testing was normal, which ruled out any evidence of spinal cord lesion as a source of his problem; and the fact that spinal fluid studies showed no evidence of an infectious polyneuritis, then one is left with the diagnosis of toxic neuropathy, based on the fact that this person has a history of working around chemicals which *could* serve as a source of the toxic neuropathy." (emphasis added)

On cross-examination, Dr. Snyder testified as follows:

"Q: Doctor, what chemicals do you understand this man was working around prior to seeing you?

A: I do not know specifically.

\* \* \* \* \* \*

Q: To arrive at a diagnosis as to the cause of the toxic neuropathy in this man, wouldn't you have to know what chemicals he was exposed to, to give us information with reasonable medical certainty?

A: The basis upon which this diagnosis was arrived was based on the fact, as I indicated in my previous testimony, was the fact that this patient gave a history of having worked around several types of chemicals, and this was by history, no antecedent cause of trauma or other abnormality as a source, which could serve as a source of his problem.

\* \* \* \* \* \*

Q: Well, what I am asking you, Doctor, is if in a very careful manner you would attempt to arrive at a diagnosis, which you would say was reasonably medically certain, and not merely theoretical, one of your first interests would be in knowing what chemicals he came in contact with?

A: That is correct.

Q: Wouldn't that be an important fact?

A: Yes.

Q: In arriving at a cause?

A: That is correct.

* * * * * *

Q: Now, Doctor, tell me, other than the fact that you can't think of anything else that would cause toxic neuropathy, what basis, in talking with this man or talking with anyone at Noranda, gave you a fact which you thought led to the connection of the toxic neuropathy with something he did at the plant?

A: This diagnosis was made, and the relationship of the chemicals, *presumably*, where he worked was based on the fact and the history that he had not come in contact with any other type of chemicals. It was a diagnosis primarily of exclusion, in that since the man had no history of being in contact with any other chemicals, and from the history that he gave, that he had worked around chemicals on his job, and since the diagnosis was primarily established by the EMG testing, that this was *probably* a toxic neuropathy, and the diagnosis was made on the basis of a *possible* causal relationship since this was the only history of anything else that might serve as a source.

Q: Are you then, in effect, telling us that because you have excluded all other possibilities or causes, and based on what the man has told you, then you are assuming that he was in contact with chemicals; and since those are the only chemicals he became in contact with—

* * * * * *

Q: —that that is what caused the toxic neuropathy? Is that kind of where we are?

* * * * * *

Q: Is that how you got to your diagnosis and your causation, that you have excluded everything and, therefore, it must be chemicals on the job?

A: The diagnosis was arrived at by a matter of excluding other things that could cause a person to have a generalized type of neuropathy.

Q: What things could cause you to have toxic neuropathy besides chemicals?

A: Well, chemicals are the primary cause of toxic neuropathy.

Q: Are they the only thing that give you toxic neuropathy?

A: Well, if there are neuropathies of another type they are not usually thought to be toxic. There are usually other things which describe the neuropathy, other than the toxic neuropathy, so usually the toxic neuropathy does come from an extraneous source such as chemicals.

* * * * * *

Q: Let's assume for a moment that the chemical which this man was exposed to was chlorine gas, pure chlorine only, which is exhausted and let's assume that you get a relatively small amount of it, but the only chemical—and let's assume this—that is involved anywhere near where this man worked was pure chlorine gas. Now, has that chemical ever been connected with a case of toxic neuropathy in all of your studies or in any of your cases you have treated in your lifetime?

A: I think that question would have to be posed to a medical expert, which *I do not proclaim to be a medical expert in toxic neuropathy.* I can only speak of this man's clinical course and the tests we have done and my logic in arriving at the diagnosis. I don't think—and as I told this man—I don't think that I can ever come to the point that I can say one particular chemical or one particular time, that 'if you were exposed to such a chemical and this produced such a result,' but I came to that conclusion based on the fact that the EMG showed he had a toxic neuropathy; and that, with the history of his having been exposed to chemicals in his job, certainly *suggests* a casual relationship; and based on that *possibility*, I made

the recommendation that he avoid any further contact with those chemicals.

Q: Now, Doctor, let us for a moment assume this fact to be true, that the only chemical present in the area where Virgil Estes worked was pure chlorine gas and that no other chemicals are involved in any of the processes or any of the work that he was involved in. Assume that to be a true and correct fact?

A: All right.

Q: Are you telling us that the pure chlorine gas was the cause of his toxic neuropathy?

A: No.

Q: . . . [I]s it your testimony here and under oath today that the causal connection between the toxic neuropathy you found in Virgil Estes is to inhalation of pure chlorine gas, with reasonable medical certainty?

A: I cannot say that.

* * * * * *

Q: All right. Do you feel that or are you of the opinion there must be some type of chemicals, in addition to pure chlorine gas, that this guy came in contact with?

A: It is my opinion this patient has come into contact with some type of extraneous chemicals, be it whatever the source may be.

* * * * * *

Q: But you are not telling us that, with reasonable medical certainty, the inhalation of chlorine gas—

A: I am not, specifically.

Q: —in moderate amounts is a cause of the toxic neuropathy in this man, are you?

A: No, sir." (emphasis added)

Dr. Rosenbaum, a St. Louis neurologist, examined Estes at employer's request in April, 1976, shortly before the hearing, and voiced his opinion that Estes had a normally functioning nervous system and there was no evidence of toxic neuropathy. He further stated that chlorine gas had never been shown to adversely affect nerves to produce a toxic neuritis.

The referee found Estes' injury resulted from an occupational disease [§ 287.063(1), § 287.067(1) V.A.M.S.], and " . . . based on both lay and expert testimony, that employee was exposed to a hazard of fumes and chemicals in his employment . . . that caused a condition medically known as peripheral neuropathy . . . ."

A divided Commission adopted the referee's findings and conclusions and affirmed the award. The dissenting member of the Commission did not believe the competent evidence was sufficient to establish a causal relationship between employee's occupation and his ailments because the only proof in the record was that Estes was exposed to chlorine fumes and there was no evidence causally relating such fumes to his toxic neuropathy. The dissent also noted the speculative and conjectural nature of Dr. Snyder's testimony.

Section 287.067, RSMo 1969, defines an occupational disease as a disease arising out of and in the course of the employment and provides a disease shall be deemed to arise out of the employment " . . . only if there is apparent to the rational mind upon consideration of all the circumstances a direct causal connection between the conditions under which the work is performed and the occupational disease, and which can be seen to have followed as a natural incident of the work as a result of the exposure occasioned by the nature of the employment and which can be fairly traced to the employment as the proximate cause, and which does not come from a hazard to which workmen would have been equally exposed outside of the employment. The disease must be incidental to the character of the business and not independent of the relation of employer and employee. The disease need not to have been foreseen or expected but after its contraction it must appear to have had its origin in a risk connected with the employment and to have flowed from that source as a rational consequence."

In order to establish a claim under the foregoing statute, a claimant is required to prove by competent and substantial evi-

dence that there is a recognizable link between the disease and some distinctive feature of the job [*Gaddis v. Rudy Patrick Seed Division*, 485 S.W.2d 636 (Mo.App. 1972)] which is common to all jobs of that sort [*Collins v. Neevel Luggage Mfg. Co.*, 481 S.W.2d 548 (Mo.App.1972)] and, there must be evidence of a direct causal connection between the conditions under which the work is performed and the occupational disease. *Marcus v. Steel Constructors, Inc.*, 434 S.W.2d 475 (Mo.1968).

 Estes contends the evidence showed he was exposed to various chemicals, gas and fumes in his work as a direct chill operator and because his condition was diagnosed as toxic neuropathy, it necessarily follows that a causal connection between his work and condition was established. We disagree.

In order to arrive at his *probable* diagnosis, Dr. Snyder necessarily assumed Estes had been exposed to job-related chemicals. The record does not support such an assumption. As the dissenting Commission member noted, the only evidence of Estes' exposure to chemicals or fumes while performing his job was to chlorine fumes and Dr. Snyder, without qualification or reservation, refused to causally connect his diagnosis to chlorine gas. The doctor also recognized that agricultural chemicals and "other" chemicals can cause toxic neuropathy.

In *Marcus v. Steel Constructors, Inc.*, supra, claimants sought to link the inhalation of benzol fumes and fumes from welding galvanized metal and cutting and burning through layers of paint to an occupational disease which resulted in the death of the employee. In reversing the award of the Commission, the court said: "We find no medical evidence that [employee] had been exposed to benzol fumes. Dr. Sirridge did not name any specific toxic substance to which [employee] was exposed. Although in answer to a hypothetical question which *assumed* that [employee] had been exposed to fumes and that benzol was used in the printing plant, it was her opinion that there was a probable connection between the toxic exposure and the damage to the bone marrow which resulted in the condition which brought about his death. Neither Dr. Sirridge nor Dr. Silver stated that the fumes produced from welding galvanized metal or the fumes produced by burning through layers of paint with an acetylene torch were toxic or would cause pancytopenia. Dr. Sirridge only discussed the *possibility* that the second exposure *might* have been from welding the metal and burned paint. . . . Inferences, to be permissible, must be reasonable, and no fact may be found nor an award be based upon mere suspicion or conjecture."

As the court said in *Welker v. MFA Central Co-Operative*, 380 S.W.2d 481 (Mo.App. 1964), "We think the question of causation was one for medical testimony, without which a finding for claimant would be based on mere conjecture and speculation and not on substantial evidence."

We hold that in the instant case the finding adopted by the Commission that there was causal connection between Estes' job and the condition diagnosed by Dr. Snyder is not supported by competent and substantial evidence. Accordingly, we affirm the judgment of the lower court reversing the award.

FLANIGAN, C. J., and HOGAN, J., concur.