**Duane KENT, Deceased, Lawanda and Bethany Kent, Respondents,**

v.

**GOODYEAR TIRE AND RUBBER COMPANY and Travelers Indemnity Company of America, Appellants.**

No. WD 63481.

Missouri Court of Appeals, Western District.

Nov. 2, 2004.

Randall W. Schroer, Kansas City, for Appellant.

Elizabeth Diane Baker, Kansas City, for Respondent.

RONALD R. HOLLIGER, Judge.

Goodyear Tire and Rubber and its insurer appeal a workers' compensation award by the Labor and Industrial Relations Commission. The Commission awarded death benefits to the widow and minor child of a deceased employee, Duane Kent, on the basis that his work as a tire retreader was a substantial factor in causing him to suffer lung cancer, which ultimately caused his death.

Goodyear raises three points on appeal. In Point I it claims that the Commission erred in finding that the workplace conditions caused Kent's lung cancer because there was not substantial and competent evidence from which to find, as required, that Kent's illness (defined by Goodyear as metastatic adenocarcinoma) was caused by exposure at work. Point II claims that the Commission acted without or in excess of its powers and that the award was against the overwhelming weight of the evidence because Goodyear's experts were overwhelmingly more credible and the Commission did not properly consider the opinion of the administrative law judge. Point III argues that the Commission acted without or in excess of its powers because it improperly disregarded one of the expert opinions offered by Goodyear. Affirmed.

## Facts

Duane Kent worked in the tire industry beginning in 1957 until 1998, with the exception of a three-year military tour in the early 1960's. During most of Kent's career in the tire industry he was involved in retreading and repairing truck tires.

The process of retreading tires involves grinding off old tread, placing a thin layer of rubber onto the tire, putting on new tread, putting the tire into a chamber, and vulcanizing the tire in order for the new tread to adhere to the old tire. Vulcanization involves intense heat under pressure. Various chemicals are used in the process, including solvents and adhesives. "Curing" tires and "vulcanizing" tires refer to the same process.

Part of Kent's duties required him to "buff" the tires. The "buffing" of tires produced dust that invariably ended up on Kent. Kent's wife testified that he would come home covered with black particles on his clothing, in his hair, in his eyes, in his nose, in his mouth, and even his wallet. His wife had to wash his clothes separately because of the quantity of black particles that would be on his clothing. The plant manager also stated that it would not be unusual for Kent to be covered with a fine dust because Kent did the grinding of the tires.

Most of Kent's work took place on the other side of the plant from the curing chamber where the majority of chemicals were used, but Kent "floated" when needed to other areas of the plant. Additionally, Kent's "buffing" responsibility took place near the curing chamber. The workers at the retreading plant were provided with particle masks but no respirator system.

Kent never smoked and was not exposed to second hand smoke. Two of his homes were tested for radon and both homes tested negative for any significant radon exposure.

Kent was diagnosed with metastatic adenocarcinoma of the lungs in August of 1998 and received workers' compensation benefits until October of 1999. Kent was prescribed chemotherapy by Dr. Larry Rosen, an oncologist, for his cancer which eventually spread to his brain. Kent underwent various cancer treatments over the next year until he died on December 9, 2000.

## Standard of Review

This is an appeal from an award from the Labor and Industrial Relations Commission. When reviewing such an award, appellate courts "must examine the whole record to determine if it contains sufficient competent and substantial evidence to support the award, i.e., whether the award is contrary to the overwhelming weight of the evidence." *Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220, 222–23 (Mo. banc 2003). "Whether the award is supported by competent and substantial evidence is judged by examining the evidence in the context of the whole record." *Id.* at 223. The reviewing court is no longer required to view the evidence in the light most favorable to the Commission's decision. *Id.*

## Discussion Point I

Occupational diseases are compensable under the Missouri Workers' Compensation Act; § 287.067.1 & .2. The statute requires that the condition be an "identifiable disease arising with or without human fault and in the course of the employment." *Id.* Subsection 2 of Mo.Rev.Stat. § 287.067 adopts the causation standard for occupational disease claims as stated in § 287.020.2; the employee's work must be "a substantial factor" in causing the medical condition. Thus, for an injury to be compensable under the Missouri Workers'

Compensation Act, the work performed must have been a substantial factor in causing the medical condition or disability.

■■■ With regard to factual issues, the appellate court defers to the Labor and Industrial Relations Commission's decisions regarding the weight given to witnesses' testimony, and is bound by the Commission's factual determinations when the evidence supports either of two opposing findings. *Smith v. Tiger Coaches, Inc.*, 73 S.W.3d 756, 761 (Mo.App.2002); *Doughton v. Marland Refining Co.*, 331 Mo. 280, 53 S.W.2d 236, 241 (1932). A single expert's opinion may be competent and substantial evidence in support of an award of benefits, even where the causes of the occupational disease in question are indeterminate in nature. *Kelley v. Banta & Stude Constr. Co.*, 1 S.W.3d 43, 48 (Mo. App.1999).

Goodyear argues on appeal, essentially, that the Commission's characterization of Kent's disease was overbroad and generic thus leading to an incorrect conclusion not supported by substantial and competence evidence. Goodyear argues that the proper characterization of Kent's disease is not lung cancer but the specific kind of lung cancer called metastatic adenocarcinoma. Characterizing Kent's disease as such allows Goodyear to argue that respondent has failed to establish causation and thus failed to prove an essential element of his action. In other words, Goodyear argues that Kent was required to produce evidence of a specific chemical causing the specific disease metastatic adenocarcinoma (not simply lung cancer). Because he did not, Goodyear argues that he failed to make a submissable case under the Workers' Compensation Act.

Based upon review of various studies, Kent's history, and his medical records, Dr. Larry Rosen, the treating oncologist, concluded that Kent's work was a caus-

ative factor of his cancer. Specifically, Dr. Rosen, the only cancer specialist in the case, found:

Mr. Kent was a non-smoker. He worked for Firestone Tire Company for many years and then for Goodyear Tire beginning in 1987. I believe that Mr. Kent's lung cancer resulted from exposure to chemicals in the tire industry and furthermore his exposure to these products was greater than that which affects the public generally. I have reviewed Mr. Kent's medical records and I have reviewed various articles in the literature. My opinion expressed above is based on reasonable medical certainty.

Dr. Andrew Myers also concluded that Kent's work was a substantial factor in causing Kent's lung cancer. Meyers reached this conclusion after examining Kent, the medical journals, and Kent's medical records. Meyers attributed causation of the lung cancer to Kent's work because Kent never smoked, was not exposed to second hand smoke, and radon exposure was ruled out as a source. Meyers concluded that Kent's exposure in the tire industry was a substantial factor in his development of cancer because the main causes of lung cancer were ruled out as a source and because Kent had a lengthy work history in the tire industry.

Goodyear produced three experts in support of its position. Dr. Doull, a clinical toxicologist, testified that workers in similar conditions to Kent's often develop lung cancer but not necessarily adenocarcinoma. Dr. Doull reviewed the chemicals that Kent was likely exposed to while at work and concluded upon reasonable medical certainty that none of the chemicals were responsible for Kent's disease.

Dr. Barkman, an internal/environmental medicine and pulmonary disease specialist, relied upon Dr. Doull's toxicology data, his

general medical and pulmonary knowledge, and the information provided to him in reaching his conclusions. He did no independent research for the case. Dr. Barkman testified that adenocarcinoma can arise from anything that can scar the lung or even spontaneously. He testified that there was not enough evidence in Kent's case to persuade him that there was a causal connection between Kent's cancer and his employment. Barkman did acknowledge that there was scholarship on both sides of the issue of cancer caused by dust exposure.

Finally Dr. Kerby, a specialist in internal medicine and pulmonary disease, examined Kent shortly before he died. Dr. Kerby's opinion was that Kent's lung cancer was not caused by his employment as a tire retreader. Dr. Kerby identified faults in the four studies and excerpts that performed testing of the causal connection between cancer risks and working in the rubber industry. He concluded that none of the studies met the "Bradford Hill" criteria to establish causation between exposure and the disease. When questioned as to what could be the cause of Kent's cancer, Kerby stated that a fair proportion of lung cancers are caused by unknown sources and are a common phenomenon of aging.

### *Analysis*

■ Goodyear first argues that Kent has failed to prove causation because he showed only a generic causal connection and failed to link Kent's specific disease (metastatic adenocarcinoma) to a specific chemical Kent was exposed to while working. Respondent offered the only cancer specialist in this case and another physician who both testified that Kent's employment caused his cancer. Goodyear countered with three specialists who all testified that the specific chemicals Kent

experienced during employment did not cause his metastatic adenocarcinoma. Contrary to Goodyear's argument, claimants in an occupational disease claim under workers' compensation are not required to prove a specific chemical cause of disease.

If the evidence lends itself to differing factual inferences, the court is obligated to defer to the administrative agency's findings unless those findings are contrary to the overwhelming weight of the evidence. *Smith*, 73 S.W.3d at 760–61. The standard for expert opinion was recently defined in *State Board of Registration for Healing Arts v. McDonagh*, 123 S.W.3d 146 (Mo. banc 2003). In defining the standard the Missouri Supreme Court said, "Section 490.065.3 requires that the facts and data on which an expert relies must be those reasonably relied on by experts in the relevant field." *Id.* at 149.

■ Missouri law does not require a finding of which specific chemical caused the occupational disease in question in order to recover under the Workers' Compensation Act. To prove causation it is sufficient to show "a recognizable link between the disease and some distinctive feature of the job which is common to all jobs of that sort." *Polavarapu v. Gen. Motors Corp.*, 897 S.W.2d 63, 65 (Mo.App.1995). Several Missouri cases conflict with the logic Goodyear uses to dispute causation.

In *Skinner v. Dawson*, the Court upheld an award by the Commission to compensate the claimant's eye injury as an occupational disease caused by fumes experienced at work as a welder. 575 S.W.2d 935, 941–43 (Mo.App.1978). The employer argued and produced expert evidence that it was not likely the specific eye disease (retrobulbar neuritis) was caused by the specific fluoride vapors experienced by the claimant while at work. *Id.* at 942. Nevertheless, the Court held that causation

was supported by substantial and competent evidence because the claimant's treating physician testified unequivocally that the eye disease was caused by the "irritating material" claimant experienced at work. *Id.*

Similarly, in *Polavarapu v. General Motors Corp.,* the Court held that the claimant's lung disease of hypersensitivity pneumonitis resulted from her occupational exposure to "different polymers, plastics, sand and dust" she inhaled into her lungs while working for her employer. 897 S.W.2d 63, 64 (Mo.App.1995). The Court did not require a finding of which specific chemical was involved, only that "a recognizable link between the disease and some distinctive feature of the job which is common to all jobs of that sort." *Id.* at 65. Other similar cases demonstrating the Missouri approach to proving causation in occupational disease cases include: *Passe v. City of St. Louis,* 741 S.W.2d 109 (Mo. App.1987) (Commission's decision that a fireman's throat cancer was compensable due to the fireman's exposure to heavy smoke, gases and fumes was upheld); *Sellers v. Trans World Airlines, Inc.,* 776 S.W.2d 502 (Mo.App.1989) (claimant's lung cancer compensable due to his working with and around chemicals, degreasing agents, paint and other materials).

Appellant relies heavily upon *Estes v. Noranda Aluminum, Inc.,* 574 S.W.2d 34 (Mo.App.1978), and *McGrath v. Satellite Sprinkler Systems, Inc.,* 877 S.W.2d 704 (Mo.App.1994); however, neither case supports its position. In *Estes,* the court reversed the Industrial Commission's finding that there was a causal connection between an aluminum company employee's job as a direct chill operator and his diagnosed condition of toxic neuropathy. 574 S.W.2d at 38. The Court found that the Commission's findings as to causation were not supported by substantial and competent evidence because the employee's expert did not testify that there was a causal relationship between chemical exposure but only that exposure to some chemical *could* cause the condition of toxic neuropathy. *Id.* at 36–37. *Estes* is clearly different from the case at bar because respondent did produce a medical expert, actually two, who were willing to directly testify as to causation.

Similarly, *McGrath* is also inapposite to the case at bar as applied by the appellant. In *McGrath,* the Eastern District correctly used the standard of review (substantial and competent evidence) to affirm the Commission's finding that the employee failed to prove causation. *McGrath,* 877 S.W.2d at 709. The specific facts of *McGrath* as compared to the facts of the present case bear little similarities.

First, unlike Kent, the employee in *McGrath* could not prove to the Commission that he was even working at the location where he said he was injured. *Id* at 707. The only evidence he offered as to that point was his testimony which conflicted with employee records and co-employee memories. *Id.* Second, the employee in *McGrath* could not produce one medical expert who could testify concretely as to causation. *Id.* at 708. One expert couldn't say which of two accidents, only one of which may have occurred while at work for the employer, was the cause of the injury and another expert changed his opinion as to causation when the employee changed his story about when the accident occurred. *Id.*

Predictably, the Court in *McGrath* found that the Commission's finding as to lack of causation was supported by substantial and competent evidence. *Id.* at 709.

Similarly, in the present case, this court need not and should not substitute its judgment as to the credibility of the ex-

perts. It should simply "examine the whole record to determine if it contains sufficient competent and substantial evidence to support the award, i.e., whether the award is contrary to the overwhelming weight of the evidence." *Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220, 222–23 (Mo. banc 2003). Respondent presented medical evidence in this case that meets the standard of competent and substantial evidence.

Whether Mr. Kent's affliction is called lung cancer or metastic adenocarcinoma, ultimately, the cause of Kent's disease depended upon the acceptance or rejection of conflicting medical opinions or theories. Therefore, it was up to the Commission, not this court, to decide which of the two lines of expert reasoning was more credible as to causation. *Tangblade v. Lear Corp.*, 58 S.W.3d 662, 669–70 (Mo. App. W.D.2001) ("[W]here the right to compensation depends upon which of two conflicting medical theories should be accepted, the issue is peculiarly for the Commission's determination."). Point I is denied.

Point II argues that the Commission acted "without or in excess of its powers" and that the award was against the overwhelming weight of the evidence. Goodyear argues that the Commission abused its discretion by not taking into consideration the credibility determinations of the administrative law judge and, basically, finding that the respondent's experts were more credible than the Goodyear's experts.

In support of its propositions, Goodyear points to the differences in resume credentials (i.e., publications, teaching experience, and committee memberships) between the parties' testifying experts. Additionally, Goodyear argues that greater consideration should have been given to the credibility determinations of the administrative law judge with respect to the expert witnesses.

The ultimate determination of credibility of witnesses rests with the Commission. However, the Commission should take into consideration the credibility determinations made by the administrative law judge (ALJ), particularly, where the ALJ "had the witnesses before him and was thus in a position which gave him a great vantage ground over members of the Commission who afterwards had only the opportunity of reading a transcript of the testimony." *Davis v. Research Med. Ctr.*, 903 S.W.2d 557, 569 (Mo. App.1995) (overruled on other grounds). When it reviews an award entered by the ALJ, the Labor and Industrial Relations Commission is not bound to yield to his or her findings, including those relating to credibility, and is authorized to reach its own conclusions. *Id.*

Goodyear does not point to any evidence in the record that the Commission did not take into consideration the ALJ's credibility determination. Regardless, the law only requires the Commission to take into consideration the credibility determination of the ALJ, not give that determination deference. The policy behind taking into consideration the ALJ's opinion is that the ALJ generally views expert testimony live. Viewing the testimony live is considered to be an advantage over Commission members who must make their decision based upon reading a transcript. However, in this case, only one out of the five experts testified live before the ALJ. An ALJ is no more qualified than the Commission to weigh expert credibility from a transcript or deposition. *Pavia v. Smitty's Supermarket*, 118 S.W.3d 228, 239 n. 4 (Mo.App.2003).

The rest of Point II of Goodyear's brief focuses almost entirely on the claimed lack of qualifications of one of Kent's experts,

Dr. Meyers. The other expert, Dr. Rosen, is only mentioned in Goodyear's brief in passing when Goodyear correctly identifies that Rosen has "never held a teaching position." Assuming arguendo, that Meyers was incompetent and the Commission could not have reasonably held that Meyers was capable of offering competent and substantial evidence, there is still enough evidence to sustain the Commission's finding under our standard of review. A single medical opinion will support a finding of compensability for occupational disease even where the causes of the disease are indeterminate. *Kelley v. Banta & Stude Const. Co.,* 1 S.W.3d 43, 48 (Mo.App.1999).

■ Goodyear cites no authority to support its position that this court should act as a "gate keeper" and re-examine the credibility of experts based upon the content of their resumes. To be sure, an expert's qualifications are relevant in the process of weighing the credibility and admissibility of expert evidence. However, no objections were made to the competency of Kent's experts, the reliability of the data they utilized, or the admissibility of their opinions. This court does not on review weigh the credibility of witnesses and is not a "gate keeper" for the reliability of expert opinions as Goodyear suggests.

Point III of Goodyear's brief argues that the Commission improperly "disregarded the opinions of Dr. Barkman," Goodyear's expert on internal/environmental medicine and pulmonary disease. Barkman explained in his deposition that medical causation to him meant that "strong evidence" was present. Barkman defined "strong evidence" as that which would cause "everyone to come to the same realization."

In the Commission's final order it distinguished Barkman's definition of medical causation by comparing it to the standard generally used for medical causation in workers' compensation law. There is no evidence on the record that the Commission "disregarded" Dr. Barkman's opinions. In fact, the record reflects the exact opposite. Barkman's findings are discussed at length in the Commission's final order. Moreover, in the Commission's holding it states, "we find the opinions expressed by [respondent's experts] to be more credible than the opinions expressed by Dr. Kerby, Dr. Doull, and Dr. Barkman."

### Past Due Medical Expenses

The Commission awarded $93,967.56 representing past due medical bills. After trial in this case, the Supreme Court issued its decision in *Farmer–Cummings v. Personnel Pool of Platte County,* 110 S.W.3d 818 (Mo. banc 2003). Because of the application of this decision, the parties have stipulated that the proper amount of unpaid medical bills is $4557.69. The award of the Commission is, therefore, modified to award $4557.69 as unpaid past due medical expenses.

The award is affirmed as modified.

THOMAS H. NEWTON, Presiding Judge, and HAROLD L. LOWENSTEIN, Judge, concur.