Norman HEISKELL, Deceased; Paula Heiskell, Dependent Spouse; and Charissa and Aaron Heiskell, Dependent Children, Appellants,

v.

**GOLDEN CITY FOUNDRY, INC., Respondent,**

and

**Traveler's Casualty and Surety, Co., Respondent.**

No. 29054.

Missouri Court of Appeals, Southern District, Division One.

Aug. 22, 2008.

Becky J.W. Dias, Morrison, Webster & Carlton, Springfield, for Appellants.

Katharine M. Collins, Law Offices of Daniel P. Hanson, Overland Park, KS, for Respondents.

ROBERT S. BARNEY, Judge.

Appellants Norman Heiskell ("Employee"), now deceased; Paula Heiskell

("Wife"), Employee's dependent spouse; and Employee's dependent children, Charissa Heiskell ("Charissa") and Aaron Heiskell ("Aaron") (collectively "Appellants") appeal from the Labor and Industrial Relations Commission's ("the Commission") "Final Award Denying Compensation" ("the Final Award") for worker's compensation benefits based on Employee's death. Appellants assert two points of Commission error.

The record reveals that on November 19, 2003, Employee, a forty-eight-year-old man, passed away at his home due to a pulmonary embolism. Employee had been employed with Respondent Golden City Foundry, Inc. ("Employer") for thirteen years and co-owned the company with his cousin, Tony Peterson ("Mr. Peterson").[1]

On August 19, 2004, a "Claim for Compensation" was filed by Appellants with the Missouri Department of Labor and Industrial Relations, Division of Worker's Compensation ("the Division"), based on Employee's death "from complications due to work-related blunt trauma" he purportedly received in October of 2003. On September 24, 2004, a "Report of Injury" was filed with the Division by Appellants on Employee's behalf. It set out that Employee had been injured while at work on October 31, 2003, at approximately 12:00 a.m.; however, no other details relating to how or where Employee was injured were included in the report. In their answer to Appellants' claim, Employer and Insurer stated that while Employee was employed during the time of the alleged injury they were not notified of the injury as required

by section 287.420 and, accordingly, Employer and Insurer denied all of Appellants' claims.[2]

On May 2, 2007, a hearing was held before an Administrative Law Judge ("ALJ"). At the hearing on this matter, the deposition of Employee's father, Norman Heiskell, Sr. ("Father"), was entered into evidence. Father testified that one morning in late October of 2003 he saw Employee walking down the sidewalk toward Employer's place of business. He stated that Employee "was limping real bad" and that it was "[v]ery noticeable;" however, Father could not recall which leg appeared to be injured. When Father asked Employee about the limping, Employee stated he "about broke [his] leg" while at work when he was "loading something or moving something." Father indicated he "wasn't familiar with the equipment [Employee] was telling him about" and he "couldn't get the picture of it exactly," but he understood that "something fell off of something and dropped and hit [Employee] on the leg," thus, causing him to limp. Father testified that Employee indicated the item which hit him "weighed about 500 pounds." Employee told Father he would "be all right" and did not need help finishing work nor did he need to seek medical treatment. Father testified Employee was not the type of person to complain of such things and they did not discuss the issue again.

Father also testified that on November 16, 2003, three days prior to Employee's death, Employee passed out at his home while preparing to go deer hunting with

1. Respondent Traveler's Casualty & Surety, Co. ("Insurer") is Employer's workers compensation insurance provider.

2. We note this matter was decided under the law in effect at the time of [Employee's] injury, which was prior to the August 28, 2005, effective date of the "significant changes to

the Workers' Compensation Act in Senate Bill 1...." *See Custer v. Hartford Ins. Co.,* 174 S.W.3d 602, 629 n.3 (Mo.App.2005); *see also Dalba v. YMCA of Greater St. Louis,* 69 S.W.3d 137, 140 (Mo.App.2002). Accordingly, all statutory references are to RSMo 2000 unless otherwise stated.

his son. Employee was taken to the hospital for observation and his treating physician indicated Employee should stay in the hospital for 48 hours so that certain tests could be performed. Father stated Employee did not want to stay at the hospital and returned home the same day he was admitted. Father stated he checked on Employee several times in the next several days; however, on November 19, 2003, Employee suffered a pulmonary embolism and died at his home.

Employee's daughter, Charissa, testified at the hearing that she was sixteen years old when her father passed away. She stated that "[a]bout three or four weeks" prior to Employee's death he asked her for some "sports cream" for an injury he had on his upper thigh. When Charissa asked Employee the origin of his injury, Employee told him that "[h]e had hit himself on— a pallet had hit him in the leg at work." She stated Employee disliked doctors and was not the type of person to complain or worry about injuries.

Employee's son, Aaron, testified at the hearing that he was thirteen years old when Employee passed away. Aaron testified that he had one conversation with Employee about a leg injury about "three weeks before he passed away." He related Employee also asked him for some sports cream for his leg. When Aaron asked about the injury, Employee told him he "was messing with a pallet ... and it started to fall and [he] had [gone] to catch it and it landed on his lower abdominal— on his leg." Aaron stated it was "unusual for [Employee] to complain about pain," which is the reason Aaron clearly recalled the conversation.

Aaron testified that the morning his father passed out as they were leaving to go deer hunting in November of 2003, he noticed Employee "had a little bit of a hitch maybe [in his leg] like it was almost stiff," but he "wasn't like limping, dragging his leg. . . ." He stated Employee's breathing was heavy that morning and he passed out on the front steps of the house. Aaron then alerted Wife and Employee was transported to the hospital via ambulance. Employee later checked himself out of the hospital against medical advice and died at home three days later.

Wife testified that Employee had diabetes for which he was prescribed medicine, but that he only "sometimes" took his pills. She stated she was unaware that Employee was suffering from "any ongoing problems, symptoms, weakness or anything like that from diabetes ..." prior to his death. She stated Employee never complained about "pain and bumps and bruises and aches ..." and that he disliked doctors. Wife testified she was not aware of any accident Employee may have had at work prior to his death. She stated Employee probably did not tell her about the accident because he knew she would want him to go to the doctor.

George Nichols ("Mr. Nichols"), a friend of Employee's, testified via deposition, that in November of 2003 he observed Employee "kind of limping." He related that he asked Employee what he had done and Employee stated " 'Oh, I was acting stupid and hurt myself a little.' " He stated he saw Employee limping "for two or three days" and that was the only conversation he had with Employee about the injury.

On Appellants' behalf, the deposition and medical report of Dr. P. Brent Koprivica ("Dr. Koprivica") was entered into evidence. In his deposition, Dr. Koprivica testified that he believed, based "solely" on Father's deposition relating to the supposed work-related injury, that Employee was injured while at work, which "caused the deep venous thrombosis which is a blood clot in the extremity that embolized to cause the pulmonary embolism." Dr.

Koprivica stated that at the time of Employee's death he had a "history of multiple syncopal episodes" or "fainting spells;" was "markedly obese;" had "poor control" over his diabetes; was a smoker; suffered from an enlarged heart; had some "mild to moderate stenosis of the right coronary artery;" had a large "green-brown contusion with abrasion in the left lower quadrant of the abdomen;" and a large contusion "on the interior left forearm." He also acknowledged that the physician who treated Employee three days prior to his death made no note "of an altered gait" by Employee and acknowledged the absence of medical evidence to support the theory that Employee suffered a work-related injury. Dr. Koprivica testified that while Employee's poor health and diabetes put him at greater risk for a pulmonary embolism, those factors alone could not have caused the pulmonary embolism that killed him and the only explanation for Employee's death was the work-related injury reported by Father in his deposition testimony.

Further, the records of Dr. P.W. Christianson ("Dr. Christianson"), Employee's primary care physician, were entered into the record at the hearing. Dr. Christianson had a follow-up appointment with Employee on November 17, 2003, following Employee's release from the hospital. Dr. Christianson's records detailed Employee's "syncopal episode," but there is no mention of Employee reporting leg pain or a work-related injury.

Likewise, Employee's medical records from his hospital treatments on November 16, 2003, and the date of his death, November 19, 2003, were entered into evidence. There is no mention in those records of a leg injury on the part of Employee or any reported leg pain or other related physical problems.

Employer entered the deposition and medical report of Dr. Robert Boulware ("Dr. Boulware") into evidence. Dr. Boulware testified that he had a great deal of experience treating deep venous thrombosis and pulmonary embolisms. He related there were many risk factors for such problems including "prolonged immobilization;" trauma; various issues related to blood viscosity; obesity; underlying diseases such as diabetes or kidney disease; and certain medications. He also stated there were numerous things that can lead to the formation of a blood clot other than an incident of trauma. Dr. Boulware related that in the medical records he reviewed he did not see any reference to a trauma to Employee's leg or any leg pain prior to his death. He testified "the most significant thing [he] noticed [in Employee's medical records] is that [Employee] had a history of ... a sudden loss of consciousness and an inability to maintain an upright posture." He stated such symptoms are "consider[ed] to be very significant and would require at least a very aggressive outpatient evaluation ... to rule out things such as ... a pulmonary embolus."

Dr. Boulware also related that when Employee was taken to the emergency room on November 16, 2003, the records reveal he was suffering from numerous symptoms which would indicate a possible syncopal episode or pulmonary embolus, such as the fact that he was "cyanotic, meaning blue around his oral cavity;" had a low oxygen level; was experiencing tachycardia; and had heightened pressure in his heart. Dr. Boulware noted that Employee had Type II diabetes, which was not controlled, and that the hospital records show that he "had a hyperviscosity state related to that. That means his blood is thicker than it should be because of the circulating blood sugar in his blood." He stated that Employee was obese

"which is a risk factor for ... pulmonary embolism" and he had "an elevated PTT level which suggests the possibility of an underlying hypercoagulable state ... which unfortunately carries a 50 to 70 percent risk of blood clotting ... so that's quite a large risk factor." Dr. Boulware noted that the autopsy report indicated Employee had an enlarged heart which is a sign of heart failure and could have led to clotting problems. He also related Employee left the hospital after signing a form stating he was leaving "against medical advice" and, thus, the emergency room physicians were unable to treat him fully and resolve his medical issues. Dr. Boulware concluded that numerous things could have caused Employee's death by pulmonary embolism and he could not conclusively state the specific cause of the embolism. Further, he stated there is "[n]o medical evidence to support" Appellants' claims that Employee died from a work-related trauma and that such a trauma would merely be a factor to consider.

Mr. Peterson testified at the hearing and by deposition that he was not notified by Employee that he had purportedly been injured at work in October of 2003. Mr. Peterson testified that he never saw Employee limping during the time frame at issue and he spoke with three of Employee's co-workers who related they also did not see Employee limping. Mr. Peterson further testified he and Employee were "very close" and he had not noticed any physical difficulties on the part of Employee at the time of the supposed injury. Prior to his death in November of 2003, Employee did tell Mr. Peterson he had not been properly caring for his diabetes and that he had not been taking his medication as instructed.

The ALJ issued its "Award" on July 31, 2007, in which it found that Employee's injuries were the result of a work-related accident which caused a "pulmonary embolism which resulted in [E]mployee's death ..." such that Appellants were entitled to death benefits; that Dr. Koprivica's testimony was more persuasive than that of Dr. Boulware; and that Employer and Insurer were ordered to pay medical benefits to Appellants in the amount of $1,511.15 as well as funeral expenses in the amount of $5,000.00.

On August 3, 2007, Employer and Insurer filed an "Application for Review" of the ALJ's findings with the Commission "[d]ue to the unusual circumstances surrounding [Employee's] death and alleged work injury...."

On March 11, 2008, the Commission issued its "Final Award Denying Compensation [and] Reversing Award and Decision of [the ALJ]." The Commission disagreed "with the conclusion reached by the [ALJ], reverse[d] the award, and conclude[d] that the death of [Employee] was not due to an accident arising out of and in the course of his employment." After reciting the relevant facts, the Commission stated it was denying "death benefits on two separate grounds: (1) [Appellants] did not meet their burden of proof that [E]mployee sustained a [work-related] accident as alleged sometime in October 2003; and (2) consequently, [Appellants] failed to satisfy their burden of proof that a [work-related] injury caused the death of [E]mployee." The Commission noted "all of the relevant and pertinent treating medical records are devoid of any history of a [work-related] accident or even trauma occurring to [Employee] prior to his death ..." and that, based on the medical testimony offered at the hearing, "it is not possible to determine the cause of [Employee's] pulmonary emboli which lead to [E]mployee's death." The Commission found Dr. Boulware's testimony "to be more credible, persuasive, trustworthy and worthy of belief" than

that of Dr. Koprivica and decided not "to defer to the credibility finding of the [ALJ]." Accordingly, the Commission reversed the award of the ALJ and found Appellants "are not entitled to any amount of compensation payable." This appeal by Appellants followed.

■■■ Section 287.495.1 provides the standard of review for a workers' compensation case. It states in relevant part:

The court, on appeal, shall review only questions of law and may modify, reverse, remand for rehearing, or set aside the award upon any of the following grounds and no other:

(1) That the [C]ommission acted without or in excess of its powers;

(2) That the award was procured by fraud;

(3) That the facts found by the [C]ommission do not support the award;

(4) That there was not sufficient competent evidence in the record to warrant the making of the award.

*See Hampton v. Big Boy Steel Erection,* 121 S.W.3d 220, 222 (Mo. banc 2003).[3] "A court must examine the whole record to determine if it contains sufficient competent and substantial evidence to support the award...." *Id.* at 222–23. "The Commission's interpretation and application of the law ... are not binding on this [C]ourt and fall within our realm of independent review and correction." *Bowers v. Hiland Dairy Co.,* 132 S.W.3d 260, 263 (Mo.App. 2004).

In their first point relied on, Appellants assert the Commission erred in reversing the ALJ's award "because it applied the wrong legal standard, in that it used a post–2005 (new law) analysis on a pre–2005 (old law) case." Appellants argue the Commission erred in that "[n]o mention was made in the award of the differing standards that were created by that major law change" and the "findings made by the Commission should show whether the basis of its decision was an issue of fact or a question of law" "in the light most favorable to [Employee]."

Having reviewed the Commission's lengthy award, we must disagree with Appellants. In our review we first note that Appellants urge error in the fact that the Commission did not mention "the differing standards that were created by th[e] major [2005] law change." However, Appellants cite this Court to no authority for such a requirement. *See Richmond v. Springfield Rehab & Healthcare,* 138 S.W.3d 151, 154 (Mo.App.2004) (holding that an appellate brief is deficient per the Missouri Rules of Court where it fails to cite authority for an argument or fails to specify why such a citation is unavailable). Additionally, in our review of the Commission's award we note all of the case law cited by the Commission is from pre–2005, such that there is simply no indication that the Commission applied the wrong law to the matter at hand.[4]

■■■ Second, Appellants maintain the Commission's findings applied the wrong

**3.** We note several cases overruled by *Hampton* are cited in this opinion in support of other principles of law not affected by the *Hampton* ruling. *Hampton,* 121 S.W.3d at 224–32. No further acknowledgment of *Hampton's* effect on those cases needs to be recited hereafter.

**4.** In the argument portion of this point relied on, Appellants attempt to enlarge their argument to include issues not specifically relevant to the issues framed by their point relied on. This Court need not address issues raised solely in the argument portion of the brief which are not raised in the point relied on. *Otte v. Langley's Lawn Care, Inc.,* 66 S.W.3d 64, 72 n. 3 (Mo.App.2001). Accordingly, we shall address only those claims specifically relevant to Appellants' proffered Point I.

law in finding in favor of Employer and Insurer because "the applicable law to this case is that all doubts must be resolved in favor of [Employee] and in favor of coverage" and the Commission chose to accept the medical opinion of Employer and Insurer's expert, Dr. Boulware, as opposed to that of Appellants' expert, Dr. Koprivica. While we agree that a major tenet of the pre–2005 case law was that the Commission should apply a liberal interpretation of the law such that " '[a]ny doubt as to the right of an employee to compensation should be resolved in favor of the injured employee,' " *Phillips v. Par Elec. Contractors,* 92 S.W.3d 278, 284 (Mo.App. 2002) (quoting *West v. Posten Constr. Co.,* 804 S.W.2d 743, 746 (Mo. banc 1991)), there has never been a requirement that the Commission must accept all of an injured employee's evidence as true. If this were the case, an injured employee would always prevail in these matters regardless of the evidence offered by an employer.

■ Here, the Commission evaluated the record as a whole and found Appellants failed to meet their burden of proof that Employee's death was caused by a work-related injury. The Commission chose the medical opinion of Dr. Boulware over that of Dr. Koprivica as it was entitled to do. It has long been held that " '[t]he Commission is the sole judge of the credibility of the witnesses, and this Court will not substitute its interpretation of factual issues for that of the Commission even if it would have made a different determination.' " *Elliott v. Indiana Western Express,* 118 S.W.3d 297, 299 (Mo.App.2003) (quoting *Garibay v. Treasurer of Missouri,* 930 S.W.2d 57, 59 (Mo.App.1996)). " 'It is within the province of the Commission to determine what weight it will accord expert testimony on medical causation.' " *Elliott,* 118 S.W.3d at 301 (quoting *Smith v. Richardson Bros. Roofing,* 32

S.W.3d 568, 575 (Mo.App.2000)). Accordingly, there is no error or misapplication of the law in the Commission's decision to find Employer and Insurer's expert to be more credible than Appellants' expert. *See id.* The simple fact that the Commission ruled against Appellants is not sufficient to support Appellants' assertion that the Commission applied the wrong law to this case. Point I is denied.

■ In their second point relied on, Appellants argue they met their burden of proving Employee's death was the result of a work-related accident several weeks before his death. They assert the Commission erred in that its "award was not supported by sufficient competent and substantial evidence...." They also maintain that they "did meet [their] burden of proof;" that the Commission's decision relating to "the conflicting medical evidence was not supported by competent and substantial evidence;" that the Commission "improperly disregarded relevant witness testimony;" and that the Commission "improperly excluded evidence without a proper objection."

It is axiomatic that for an employee's injury or death to be compensable under the workers' compensation statute, the injury or death must be due to an "accident arising out of and in the course of his employment...." § 287.120.1. " 'Arising out of' means that a causal connection exists between the employee's duties and the injury. 'In the course of employment' refers to the time, place and circumstances of the injury." *Tangblade v. Lear Corp.,* 58 S.W.3d 662, 666 (Mo.App.2001) (quoting *Cruzan v. City of Paris,* 922 S.W.2d 473, 475 (Mo.App.1996)) (internal quotations omitted). "As such, proof of the causal connection is what establishes that the condition for which compensation is sought arose out of employment. Hence, to be entitled to workers' compensation benefits,

the employee has the burden of proving, *inter alia*, that his or her injury was caused by a work-related accident." *Id.*

Here, the record supports the Commission's determination that Appellants did not meet their burden of proving Employee suffered a work-related accident which led to his death. The record shows Employee was purportedly injured at some undetermined date in late October of 2003. There was testimony from Father that Employee told him approximately a month before his death, which occurred on November 19, 2003, that he had been injured at work and Father observed him limping. Around the same time, Employee requested "sports cream" from his teenage children to rub on his leg which he stated he had injured while at work. Also, Mr. Nichols, a friend, related that in November of 2003 he saw Employee limping. Otherwise, there was little, probative evidence offered to support the proposition that Employee actually suffered a work-related accident. First, Employee did not report the accident to Employer. Mr. Peterson, who was "very close" to Employee and worked with him on a daily basis, never observed him limping and was not informed of the accident. Second, Employee did not inform Wife about the accident; she never noticed him limping; and, notably, Employee's children did not report Employee's injury to Wife. Third, there was no medical evidence relating to the accident because Employee did not seek medical attention for the injury nor did Employee subsequently inform emergency room doctors or his primary care physician about the purported accident. Save for the vague testimony of certain family members, there was simply little, objective evidence showing that Employee was injured at work.

Both Dr. Koprivica and Dr. Boulware acknowledged that Employee was obese; was a smoker; suffered from an enlarged heart; had diabetes which was not being properly treated; had a history of syncopal episodes; and had some stenosis to his arteries.

Dr. Koprivica specifically related that Employee, indeed, had certain risk factors to be considered, but Dr. Koprivica's opinion that Employee's death was the result of deep vein thrombosis was based *solely* on Father's deposition testimony that Employee was injured at work.

On the other hand, Dr. Boulware testified there was no way of knowing exactly what caused the pulmonary embolism which killed Employee, but that based on the numerous risk factors it could have been any number of things which were supported by the medical evidence. Dr. Boulware testified that he had been informed of Appellants allegations that Employee injured his leg at work, but he noted that there was no medical evidence that Employee reported such an injury to any physician and there was no report of injury or trauma to any of Employee's extremities.

Considering the foregoing expert medical testimony, the Commission found Dr. Boulware's testimony to be "more credible, persuasive, trustworthy and worthy of belief . . .;" that Dr. Boulware was "more authoritative and impressive" in his medical causation testimony than Dr. Koprivica; that Dr. Boulware is "more experienced in treating conditions of pulmonary emboli . . ." than Dr. Koprivica; and that Dr. Boulware's opinions were "extremely cogent and knowledgeable," as well as "refreshingly candid when he opines that the exact cause of the death of [Employee] cannot be determined within a reasonable degree of medical certitude." As previously set out, we defer to the Commission on issues of fact and " '[i]t is within the province of the Commission to

determine what weight it will accord expert testimony on medical causation.'" *Elliott,* 118 S.W.3d at 301 (quoting *Smith,* 32 S.W.3d at 575). The Commission was well within its province in finding the testimony of Dr. Boulware to be more credible than the testimony of Dr. Koprivica. "With regard to factual issues, the appellate court defers to the Labor and Industrial Relations Commission's decisions regarding the weight given to witnesses' testimony, and is bound by the Commission's factual determinations when the evidence supports either of two opposite findings." *Kent v. Goodyear Tire and Rubber Co.,* 147 S.W.3d 865, 868 (Mo.App. 2004).

Appellants also argue under this point relied on that the Commission "improperly disregarded" the testimony of Father, Aaron, Charissa, and Mr. Nichols in making its determination because the ALJ found their live testimony to be credible and the Commission did not defer to the ALJ's findings. Appellants additionally maintain the Commission "improperly excluded evidence without a proper objection" in that it found the testimony of Father, Aaron, and Charissa to be "based on hearsay statements made to each of them on one single occasion by the deceased [E]mployee." Appellants urge error in the fact that "no objections as to hearsay were made at the time of trial" and the Commission cannot on its own accord raise hearsay objections which are waived if not raised at trial.

Here, the Commission found it was not going to defer to the credibility findings of the ALJ:

> The [ALJ] relied on the testimony of witnesses ... to conclude that due to a blunt force trauma to [E]mployee's leg in October 2003, [E]mployee sustained a [work-related] injury. The testimony of each of these ... witnesses concerning any possible accident occurring at work

sometime in October 2003, was based on hearsay statements made to each of them on one single occasion by the deceased [E]mployee. Due to the absence of any supporting documentation or corroboration from any type of additional evidence and the inherent bias of these ... witnesses the Commission does not afford such testimony much weight in order to find that there was a [work-related] accident.

■ Furthermore, there is nothing in the record to suggest the Commission actually excluded the testimony of Aaron, Father, and Charissa. The Commission merely found them not to be credible in that their only knowledge of the purported injury came from statements made by Employee to each of them on singular occasions in October or November of 2003. Being family members the Commission found their remarks to be inherently biased, particularly when other corroborating evidence was lacking. Furthermore, it is our view that the Commission's use of the word "hearsay" did not constitute a legal ruling that the testimony was excluded as a matter of law. We reiterate, "[t]he Commission is the sole judge of the credibility of the witnesses, and this Court will not substitute its interpretation of factual issues for that of the Commission even if it would have made a different determination.'" *Elliott,* 118 S.W.3d at 299 (quoting *Garibay,* 930 S.W.2d at 59). "Where competent evidence or permissible inferences conflict, the choice rests with the Commission and is binding upon this court." *Clayton v. Langco Tool & Plastics, Inc.,* 221 S.W.3d 490, 493 (Mo.App. 2007) (internal quotation omitted). "In its award, the Commission explained why it differed with the ALJ on credibility issues and various facts. This indicates the Commission did not callously ignore, capriciously reject, or arbitrarily disregard the

ALJ's credibility decisions, but duly considered them in reaching its contrary result." *Ruben v. Autozone, Inc.,* 217 S.W.3d 322, 323 (Mo.App.2007). The Commission did not "improperly disregard" witness testimony as argued by Appellants. Point II is denied.

There was substantial and competent evidence to support the Final Award of the Commission. *See Hampton,* 121 S.W.3d at 222–23. We affirm the Final Award of the Commission.

BATES, J., and SCOTT, P.J., concur.